Bruce A. KLEVEN, Appellant,

v.

YUKON–KOYUKUK SCHOOL
DISTRICT, Appellee.

Nos. S–4580, 4973.

Supreme Court of Alaska.

June 4, 1993.

Rehearing Denied June 22, 1993.

Robert John, Law Offices of William R. Satterberg, Jr., Fairbanks, for appellant.

Paul H. Cragan, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Justice.

In this consolidated appeal, Bruce Kleven challenges several of the trial court's rulings which had the effect of denying him

any relief for the allegedly improper employment practices of Yukon–Koyukuk School District (YKSD), his former employer. We conclude that the trial court erred in dismissing Kleven's first action on the grounds that he failed to exhaust administrative remedies, and, thus, remand the case for further proceedings. We affirm the trial court's dismissal of Kleven's second action on the grounds that he lacked standing.

## I. FACTS & PROCEEDINGS

Kleven, a tenured educator, worked for YKSD from 1976 until December 1990. During the period relevant to this appeal, he was employed as the district's Director of Supplemental Programs. On March 28, 1990, Fred Lau, the superintendent of YKSD, sent Kleven a written evaluation informing him that his job performance as director was unsatisfactory. Lau indicated that he might remove Kleven from his director position and reassign him to a less responsible coordinator position.

After receiving this evaluation, Kleven immediately retained an attorney in order to pursue his grievances with Lau and the district. Through their respective attorneys, Kleven and Lau fought over many substantive and procedural matters. The disputed substantive issue was whether YKSD had the legal authority to reassign Kleven to a position with less responsibility and less pay.[1] The most serious procedural dispute concerned whether YKSD was statutorily and/or contractually obligated to provide Kleven with an administrative

grievance procedure ending in binding arbitration.

Alaska Statute 14.20.590, which has since been repealed, provided:

Negotiations agreements executed after July 1, 1975 shall define "grievances" and provide for grievance procedures for the certificated staff; the grievance procedure shall provide that the final step in the procedure shall be binding arbitration. The negotiations agreement shall provide a method for the selection of an arbitrator.

As a certificated member of the YKSD staff, Kleven argued that he was statutorily entitled to binding arbitration regardless of the actual terms of his contract. In addition, Kleven claimed that he was contractually entitled to the grievance procedures laid out in the negotiated agreement between YKSD and the Middle Yukon Education Association (MYEA). The final step in the MYEA agreement is binding arbitration.

In contrast, YKSD maintained that because Kleven was an administrator, he was not a member of the MYEA bargaining unit and was not entitled to binding arbitration either by statute or his contract. YKSD instead offered Kleven a 4–step grievance procedure known as "Policy No. 4.2." Policy No. 4.2 provides the following steps: (1) employee attempts to resolve the grievance with the immediate supervisor; (2) if unsuccessful, employee reduces the grievance to writing and submits it to the superintendent; (3) if still unresolved, the

---

**1.** Kleven argued that because YKSD sent his evaluation after March 16th, the district was statutorily precluded from reducing his salary or job status. *See Redman v. Department of Education,* 519 P.2d 760 (Alaska 1974). Alaska Statutes 14.20.140, 14.20.145 and 14.20.158 provide in part:

Sec. 14.20.140 Notification of nonretention. (a) If a teacher who has acquired tenure rights is not to be retained for the following school year, the employer shall notify the teacher of the nonretention by writing, delivered before March 16....

Sec. 14.20.145 Automatic re-employment. If notification of nonretention is not given according to AS 14.20.140, a teacher is entitled to be reemployed in the same district for the following school year on the contract terms

the teacher and the employer may agree upon, or if no terms are agreed upon, the provisions of the previous contract are continued for the following school year, subject to AS 14.20.158.

Sec. 14.20.158 Continued Contract Provisions. Continuation of the provisions of a teacher's contract under AS 14.20.145 or 14.-20.155 does not (1) affect the alteration of the teacher's salary in accordance with the salary schedule prescribed by state law.... (2) limit the right of the employer to assign the teacher to any teaching, administrative, or counseling position for which the teacher is qualified; or (3) limit the right of the employer to assign the teacher, as is reasonably necessary, to any school in the district.

grievance must "be presented to the Grievance Committee within five working days" after the superintendent makes its decision; (4) if still unresolved, the grievance is referred to the school board for a final decision.

It is clear from the record that by the middle of April 1990 Kleven had already proceeded, albeit informally, through the first two steps of the grievance procedures of either Policy 4.2 or the MYEA negotiated agreement. The next step under the negotiated agreement would have been arbitration. The next step under Policy 4.2 would have been the presentation of the grievances to a Grievance Committee.

It further appears from the record presented that no Grievance Committee was ever formed. Instead, YKSD's attorney wrote Kleven a letter on April 24th setting out the district's legal position and instructing Kleven "to raise a complaint to the School Board pursuant to board policy." Kleven replied with a letter on April 30th stating that because YKSD had "determined that Mr. Kleven is not covered by any aspect of the negotiated agreement, including the grievance procedure, and that Mr. Kleven may be reassigned duties or transferred at a loss of pay, benefits, rights or property ... you have left us no option but to bring your assertions to judicial scrutiny." [2]

Although aware that a School Board meeting was scheduled for May 8th,[3] Kleven filed his first action in the superior court on the same day he sent the letter to YKSD. Kleven challenged the reassignment and the binding arbitration decisions. He sought unspecified damages as well as an injunction requiring YKSD to offer him a contract as remunerative as his previous contract and also requiring YKSD to afford him a grievance procedure ending in binding arbitration.

In August 1990 Kleven moved for partial summary judgment on the issue of his entitlement to a contract for the 1990–91 school year on terms no less favorable than those he enjoyed in 1989–90. YKSD responded with motions to strike Kleven's summary judgment motion and convert the case to an administrative appeal. YKSD also asserted that Kleven had, failed to exhaust his administrative remedies because he had not presented his grievances at the school board meeting. YKSD requested that the case be dismissed with prejudice.

While these motions were pending, Kleven applied for a superintendent position in the Kake City School District. He also assumed his new duties as Coordinator of Maintenance and Special Projects. In December 1990 Kleven was offered and accepted the Kake superintendent position. He resigned from YKSD effective December 31, 1990.

Shortly thereafter, Superior Court Judge Richard D. Savell denied Kleven's partial summary judgment motion as moot. Judge Savell provided the following reason for his decision:

> Kleven filed a motion for partial summary judgment asking this Court to hold that, by law, the school district was required to renew his contract and that such renewal had to be on terms no less favorable than his former contract.

> In support of other motions before the Court, Kleven has submitted an affidavit wherein he states that he has resigned his position with YKSD and has taken other employment outside the area. Since Kleven has resigned his position for other employment, his motion is DENIED as moot.

---

**2.** Around this same time, Superintendent Lau offered Kleven a contract for the position of Coordinator of Maintenance and Capital Projects which carried a salary of almost $62,000, about $10,000 less than Kleven had made as a Director. While reserving his rights, Kleven signed the contract in June 1990.

**3.** Neither Kleven nor his attorney attended the May 8th school board meeting. At the meeting, Lau recommended that Kleven be reassigned to the coordinator position and that another YKSD employee be transferred to fill Kleven's former position. The Board approved Lau's recommendations. The Board also met in Executive Session to discuss the financial impact of Kleven's lawsuit on the district but took no record action on the merits of Kleven's grievances.

In February 1991 Kleven renewed his motion for partial summary judgment, this time seeking the *"benefits* of a contract on terms no less favorable than those he enjoyed in 1989–90." He also moved to amend his complaint to assert a "constructive discharge" claim.[4]

In March 1991 both parties requested oral argument on YKSD's motion to convert Kleven's original action into an administrative appeal. Judge Savell granted the motion and scheduled a hearing for March 19, 1991. However, prior to the hearing, Judge Savell dismissed the first action with prejudice. The judge ruled that the case was properly treated as an administrative appeal and that Kleven had failed to exhaust administrative remedies. The trial judge also awarded YKSD $22,182.70 in costs and attorney's fees.

Meanwhile, in February 1991, Kleven filed a second lawsuit seeking to compel YKSD to conduct hearings and take action on a list of 48 grievances relating to his prior employment with the district.[5] After Kleven's first lawsuit was dismissed, YKSD moved for summary judgment in the second lawsuit arguing, among other things, that Kleven lacked standing to pursue the grievances following his resignation from YKSD. Kleven cross-moved for summary judgment claiming that Superintendent Lau had refused to even bring the grievances to the school board's attention and had prohibited Kleven from bringing them himself.

After oral argument, Judge Savell ruled that Kleven lacked standing to pursue the grievances under either an "interest-injury" or "taxpayer-citizen" analysis. Judge Savell concluded that Kleven's personal interest in the appropriate grievance procedures expired when he resigned his position with YKSD. The judge also determined that the issues presented in the grievances were not of sufficient public interest to invoke "taxpayer-citizen" standing and that, in any event, a pool of more directly affected plaintiffs (i.e. current YKSD employees) would be able to pursue the grievances if necessary.

Judge Savell further ruled that because Kleven was no longer an "aggrieved employee," YKSD was not required by its own policies to further consider Kleven's grievances. The trial judge noted that Kleven's wage claims had been resolved and concluded that:

> Having disposed of his wage claims, the court cannot find a live controversy between YKSD and Kleven that survived Kleven's resignation. The remainder of Kleven's grievances concern the interpretation of a grievance policy to which he is no longer subject and the correction of working conditions that he no longer encounters. Kleven is not seeking reinstatement and there is no indication that he will ever work for YKSD again.

After determining that no exceptions to the mootness doctrine applied, the trial judge granted YKSD's summary judgment. He then dismissed the second lawsuit with prejudice and awarded YKSD $2,700 in attorney's fees which represented about 50% of YKSD's entire fees for the second suit.

Kleven appealed the rulings from both lawsuits, and the two appeals have been consolidated.

---

**4.** One odd feature of the amended complaint is that Kleven continued to request an injunction requiring YKSD to tender him a contract even though he had already contractually bound himself to work for the Kake School District. However, the amended complaint also prayed for "damages in an amount to be proved at trial for any and all loss of salary, benefits or status."

**5.** About half of Kleven's fifty grievances relate to YKSD's failure to provide a grievance procedure ending in binding arbitration; twelve grievances concern the superintendent's alleged failure to comply with safety regulations at the various school facilities and requests that fines be imposed and that an injunction issue requiring immediate compliance; a few grievances concern denied leave requests and request immediate leave approval as a remedy; and several grievances request public apologies as a remedy for the superintendent's alleged improper behavior toward Kleven during the first lawsuit.

Two grievances involve incidents where Kleven was allegedly improperly denied compensation for work he had completed. These claims were clearly not mooted by Kleven's subsequent resignation. However, Kleven assigned his wage claims to the Alaska Department of Labor (DOL), and the DOL actually collected on these claims for Kleven.

## II. DISCUSSION

### The First Lawsuit

#### A. The Mootness Ruling

Although Kleven brought two partial summary judgment motions,[6] the trial court only ruled on the first motion prior to dismissing the entire lawsuit for failure to exhaust administrative remedies.[7] The trial court never reached the merits of the legal issue presented (i.e. whether Kleven was entitled to a contract on terms no less favorable than his previous one) but instead denied the motion on the grounds that it was moot.

The trial court obviously interpreted the first motion as a request for a legal ruling that Kleven was entitled to a new contract with the concomitant relief being an injunction ordering YKSD to tender Kleven such a contract. As such, the trial court correctly observed that the *relief* Kleven sought was not suitable to his situation because Kleven had contractually bound himself to work for another school district. It would likely have been a futile gesture for YKSD to tender Kleven a contract if Kleven would have had to breach his new employment contract in order to accept the YKSD contract.[8]

■ However, the trial court's mootness ruling misses an important point. Kleven had already worked as a coordinator for several months under a contract which YKSD may have imposed on him in violation of his statutory rights. The coordinator position paid $10,000 less than Kleven's previous position so there is no question that Kleven suffered financial harm during this period.[9] In his original complaint, Kleven sought not only injunctive relief but damages as well. We conclude therefore that Kleven's decision to take another position did not, by itself, render the controversy moot. *See United States v. Geophysical Corp.*, 732 F.2d 693, 698 (9th Cir.1984) ("A claim is moot if it has lost its character as a present, live controversy."); *see also Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985) (discussing generally our discretionary mootness rule as well as exceptions to the rule). Of course, even if the mootness ruling was incorrect, the error was harmless if the trial court was correct in subsequently dismissing the case due to Kleven's failure to exhaust administrative remedies. *See* Alaska R.Civ.P. 61.

#### B. The Exhaustion of Remedies Ruling

■ Without waiting for the scheduled hearing, Judge Savell converted Kleven's original action into an administrative appeal. [R. 488–89] Under our "functional test," whenever a legislative body, including a school board, "applies policy to particular persons in their private capacities, instead of passing on general policy or the rights of individuals in the abstract, it is

---

**6.** We independently review summary judgment rulings to determine whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986).

**7.** The difference in the two motions is that the first motion anticipated injunctive relief but the second only sought a ruling that Kleven was entitled to the *benefits* of a renewed contract. The second motion could be seen as a attempt to establish liability for breach of contract, thus, setting up a damages claim for the difference between what YKSD paid Kleven as a coordinator during the last months of 1990 and what he could have made as a director under his previous contract. Under this view of the case, Kleven's employment with Kake should be considered mitigating employment and Kleven's damage claim could be extended through the remaining school year by subtracting Kleven sala-

---

ry as Kake superintendent from the salary he could have made as a YKSD director.

**8.** Of course, Kleven *could* have breached his contract with Kake or otherwise have freed himself from his contractual obligations to his new employer in order to accept a new contract with YKSD. "A case is moot when a judgment, if rendered, would have no practical legal effect upon the existing controversy." *Van Schaack Holdings, Ltd. v. Fulenwider*, 798 P.2d 424, 426 (Colo.1990). Thus, strictly speaking, the mere fact that Kleven had signed a contract with another school district did not render the summary judgment motion moot even under the superior court's view of the case.

**9.** This harm may have continued throughout the 1990–91 school year if the Kake position paid less than Kleven previously had made as a director in 1989–90.

functioning as an administrative agency." *Ballard v. Stich*, 628 P.2d 918, 920 (Alaska 1981). Although Kleven filed his first lawsuit before the school board had officially reassigned him to a lower paying position, the action essentially challenges the decision of the school board and its agent, Superintendent Lau, to reassign him and to deny him a grievance procedure ending in binding arbitration. *See Diedrich v. City of Ketchikan*, 805 P.2d 362, 365 (Alaska 1991) (In determining whether a case is functionally an administrative appeal, "[t]he key question then is whether the claim challenges a prior administrative decision."). Thus, under *Diedrich*, this case was properly changed to an administrative appeal.

The next question to be decided is whether the appeal was properly dismissed for the failure to exhaust administrative remedies.[10] In dismissing Kleven's first lawsuit, the superior court concluded that Kleven's:

> immediate commencement of this civil action deprived the Board of the opportunity to develop a record, consider the matter, and reverse the action if found to be improper. His action has likewise prevented this Court from reviewing the record and considering the propriety of the Board's action, if it did not act to Kleven's satisfaction.

. . . . .

> A factual analysis on the issue of summary judgment only supports the conclusion that Kleven did not present his grievance to the Board and has not offered a valid reason for not doing so. . . .

While the procedures for presenting his grievance were less than clear, it is not seriously suggested that Kleven's attempt to place the question before the Board was frustrated by procedural ambiguity. Nor is there any indication that Kleven made any attempt to seek clarification.[11]

Finally, Kleven's argument that any effort on his part would have been futile cannot be sustained. This argument . . . is unsupported by the record and is not capable of being verified because Kleven never made the effort.[12]

■ We have previously identified three questions which a trial court must decide when applying the discretionary exhaustion of remedies doctrine "1) is exhaustion of remedies required; 2) did the complainant exhaust those remedies; and 3) is the failure to exhaust remedies excused?" *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 98–99 (Alaska 1992).

■ The first question is answered through a balancing of the complainant's interest in the availability of adequate redress for his or her grievances and the agency's interest in applying its special expertise, correcting its own errors, developing a record, and discouraging the "deliberate flouting" of its process. *Id.* at 99. In answering the second question, we have required that the party seeking judicial review make "at least a 'good faith effort' to pursue the grievances internally." *Id.* at 100. As for the final question, we have held that the failure to exhaust remedies may be excused due to severe impracticality or futility. *See Beard v. Baum*, 796 P.2d 1344, 1349 (Alaska 1990) (the failure

10. "It is within the superior court's discretion whether to require the exhaustion of administrative or organizational remedies before reviewing an issue or claim." *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 98 (Alaska 1992).

11. This statement, at least, is not supported by the record on appeal. Kleven's April 12th letter should be considered a request for "clarification" of the grievance procedures available. Considering that, under Policy 4.2, the next step would have been presentation of Kleven's grievances to a Grievance Committee, YKSD's response instructing Kleven "to raise a complaint to the School Board pursuant to board policy"

simply added to the uncertainty over the proper grievance process. Kleven also maintains on appeal that he was frustrated in his attempt to form a grievance committee although, as YKSD notes, this assertion is unsupported by the record.

12. YKSD maintains on appeal that Kleven's failure to present his grievances at the school board meeting was particularly harmful because the district had to take prompt action to replace Kleven because the time frame in which a school district must make hiring commitments is short.

to pursue administrative remedies was excused where an employee could only proceed with the assistance of a union representative and the representative refused to assist him); *Standard Alaska Prod. Co. v. State, Dep't of Revenue,* 773 P.2d 201, 209 (Alaska 1989) ("Where exhaustion of administrative remedies will be futile because of the certainty of an adverse decision, a party need not obtain a final agency ruling before seeking judicial review.").

We agree with YKSD that Kleven's "precipitous" resort to a judicial forum can hardly be called a "good faith effort" to pursue administrative remedies. Nonetheless, in our view, the controlling issue is the fact that Kleven sought judicial review partly to determine the proper administrative procedure for his situation. In a typical case, administrative procedures are clear, and a claimant has only to follow them in order to seek relief from an administrative body. In this case, however, the parties disputed from the outset the procedural process which Kleven was entitled to follow.

■ When Kleven filed his first lawsuit, he was already at the binding arbitration stage of the grievance procedures established under the MYEA negotiated agreement, the procedures Kleven sought to employ. Kleven would have had to forego the benefits of that agreement and add another step to the grievance process if he had to go to the school board to gain access to arbitration. The United States Supreme Court has held that the "exhaustion of administrative remedies is not required when 'the question of the adequacy of the administrative remedy ... [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit.'" *Barry v. Barchi,* 443 U.S. 55, 63, n. 10, 99 S.Ct. 2642, 2648, n. 10, 61 L.Ed.2d 365 (1979) (quoting in part *Gibson v. Berryhill,* 411 U.S. 564, 575, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973)). As far as the binding arbitration issue is concerned, Kleven's claim falls within this rule.

■ We believe the threshold procedural dispute involved in this case tips the balance in Kleven's favor on the exhaustion of remedies issue. When the form of the administrative procedure is itself contested, no further exhaustion of remedies is required. Accordingly, we hold that the trial court abused its discretion in dismissing Kleven's first lawsuit with prejudice. Our resolution of this issue makes it unnecessary for us to address the other claims of error raised by Kleven with regard to his first lawsuit.

On remand, the superior court should first determine whether Kleven is entitled to the grievance procedures provided in the MYEA negotiated agreement or only to the more limited procedures established under Policy 4.2. The superior court should then remand the case to the appropriate administrative body for further proceedings. Because YKSD is no longer the prevailing party, the attorney's fee award for the first lawsuit must also be vacated.

*The Second Lawsuit*

A. *The Standing Ruling*

Our cases have identified two types of standing: interest-injury and taxpayer-citizen. *Trustees for Alaska v. State,* 736 P.2d 324, 327 (Alaska 1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2013, 180 L.Ed.2d 601 (1988). The trial court concluded that Kleven failed to establish standing to pursue his second lawsuit under either theory.[13] We agree.

■ Under the interest-injury approach, a "party asserting standing [must demonstrate] a sufficient 'personal stake' in the outcome of the controversy to ensure the requisite adversity." *Hoblit v. Commissioner of Natural Resources,* 678 P.2d 1337, 1340 (Alaska 1984). Kleven argues that he has interest-injury standing because he continues to assert damage claims "with respect to grievances concerning binding arbitration" and because he "is seeking reinstatement to his former posi-

---

**13.** The doctrines of standing and mootness are matters of judicial policy, and as such, are questions of law which we will resolve using our independent judgment. *Bowers Office Prod. v. University of Alaska,* 755 P.2d 1095, 1096 (Alaska 1988).

tion" and would therefore be subject to the rules and conditions he seeks to have reviewed. [At. 34–35]

 The problem with this argument is that Kleven *was not* asserting a claim for constructive discharge in his second lawsuit. The trial court noted this in making its ruling. The issue then is whether an employee who starts a grievance process and subsequently resigns has standing to force the employer to continue with the process and remedy problems presumably for the benefit of those employees who remain. Even under our liberal standing rules, we do not believe Kleven has established a sufficient personal stake in the case to gain standing under an interest-injury analysis. As the trial court noted, because Kleven is no longer employed by YKSD, he is no longer subject to the contested grievance procedures, nor is he threatened by the alleged safety violations.[14] *Compare Rutter v. State,* 668 P.2d 1343, 1346 (Alaska 1983) (holding that commercial fisherman had standing to challenge state's fishing permit policy because his ability to fish would be directly impacted by the number of permits granted); *with Bowers Office Prod. v. University of Alaska,* 755 P.2d 1095, 1098 (Alaska 1988) (holding that bidder did not have standing to challenge university bid review practices where bidder had abandoned claim for damages arising out of these practices and was currently only seeking declaratory relief).

 Taxpayer-citizen status is a sufficient basis to challenge allegedly illegal governmental conduct when the issues raised are of significant public concern and when the taxpayer-plaintiff is a suitable advocate of the issues involved in the lawsuit. *See Trustees for Alaska,* 736 P.2d at 329; *State v. Lewis,* 559 P.2d 630, 635 (Alaska 1977), *cert. denied,* 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977). In *Trustees for Alaska,* we noted that standing may properly be denied to a taxpayer-plaintiff where "there is a plaintiff more directly affected by the challenged conduct in question who has or is likely to bring

suit." *Trustees for Alaska,* 736 P.2d at 329. Because YKSD's remaining employees are certainly in better position to raise the grievances Kleven cites and because we have no reason to believe that current YKSD employees would be indisposed to press legitimate grievances, we agree with the trial court that Kleven has failed to establish citizen-taxpayer standing. Accordingly, we hold that Kleven's second lawsuit was properly dismissed for lack of standing.

 We also uphold the trial court's partial attorneys' fee award. *See* Alaska Civil Rule 82. The court awarded YKSD $2,700.00 in cost and fees which represented only about fifty percent of YKSD's total fees for the second lawsuit. We have previously upheld awards representing well over fifty percent of a prevailing party's actual fees and therefore find no abuse of discretion in this case. *See, e.g., Steenmeyer Corp. v. Mortenson–Neal,* 731 P.2d 1221, 1226–27 (Alaska 1987) (holding that a Civil Rule 82 award of 75 percent of actual fees was not "manifestly unreasonable").

The judgment in the first lawsuit is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. The judgment in the second lawsuit is AFFIRMED.

**14.** If Kleven had articulated a claim for constructive discharge in this second lawsuit, he would have had a sufficient interest in these issues. *See Beard,* 796 P.2d at 1349.